<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| JOHN KENNY DiLORETO, | : | |
| | : | Civil Action No. 05-2347 (DMC) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| ADMINISTRATOR | : | |
| RONALD H. CATHEL, et al., | : | |
| | : | |
| Respondents. | : | |

**APPEARANCES:**

Petitioner <u>pro</u> <u>se</u>                                 Counsel for Respondents
John Kenny DiLoreto                         Paula Cristina Jordao
New Jersey State Prison                     Morris Co. Prosecutor's Ofc.
P.O. Box 861                                Administration & Records Bldg.
Trenton, NJ 08625                           Morristown, NJ 07963

**CAVANAUGH**, District Judge

    Petitioner John Kenny DiLoreto, a prisoner currently

confined at New Jersey State Prison in Trenton, New Jersey, has

submitted a petition for a writ of habeas corpus pursuant to 28

U.S.C. § 2254.  The respondents are Administrator Ronald H.

Cathel and the Attorney General of the State of New Jersey.

    For the reasons stated herein, the Petition must be denied.

I.   BACKGROUND

A.   Factual Background

The relevant facts are set forth in the opinion of the

Supreme Court of New Jersey.[1]

> We derive our summary of facts largely from
> testimony presented at a suppression hearing conducted
> by the trial court.  On March 19, 1998, defendant's
> brother reported defendant as a missing person to the
> police department in Jefferson Township, Morris County.
> The police, in turn, reported defendant's name to the
> [National Crime Information Center ("NCIC")], which
> houses a national network of information authorized by
> Congress and made available to federal and local
> criminal justice agencies.  See 28 U.S.C. § 534.
>
> In their initial report to the NCIC, the police
> considered defendant to be "a missing person with
> involuntary status."  That designation was changed
> after a detective from the county prosecutor's office
> reviewed it and determined that defendant's status
> should have been denominated as "endangered."  The
> detective testified at the suppression hearing:
>
> > Endangered is the catch-all phrase that the
> > local police departments and the State Police
> > use regarding adult missing persons.  The
> > most important thing [is] to get a missing
> > person into the system as missing and if they
> > don't fit any of the other criteria, meaning
> > disability, a catastrophic victim, or a
> > kidnapping, we put them in under the
> > endangered [status].
>
> On March 21, 1998, two days after his initial
> call, defendant's brother again telephoned the police

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

to inform them that defendant was no longer missing.
In response, an officer attempted to remove defendant's
name from the NCIC's computer database.  The officer
did not succeed in that effort apparently because he
had entered "John K. Diloreto" into the computer rather
than the exact name contained in the database, "John
Kenny Diloreto."  Because the NCIC's computer system
rejected the attempts to cancel the Diloreto alert,
defendant's name remained in the system during the
period relevant to this appeal.

On April 8, 1998, at about 10:30 p.m., a police
officer in Fairfield, Essex County, was on patrol in a
marked police car.  He spotted a vehicle in the parking
lot of a hotel facing U.S. Highway 46.  According to
the officer, the car attracted his attention because it
was parked at an angle between two other vehicles,
exhaust was emanating from its tailpipe, and its
windows were fogged.  He also knew of reports from that
location of automobile thefts and attempted suicides.

The officer ran a check of the car's license plate
number using a mobile data terminal (MDT).  There was a
positive retrieval of data, known as a "hit," which
revealed that the vehicle's last user was listed as an
endangered missing person.  The data also provided
identifying information as well as the agency that had
reported the person missing.  The MDT's buzzer sounded
as an alarm to the officer that the foregoing
information had been retrieved. ...

After receiving the NCIC alert, the officer called
for assistance.  He also noticed that the tailpipe of
the parked vehicle was no longer emitting fumes and
concluded "[t]hat the engine had been shut off."  A
second officer arrived a few minutes later.

After that arrival, the first officer approached
the parked car and shone his flashlight into it.  The
officer testified that, without the aid of a
flashlight, he "couldn't see inside the car because of
the condition of its [fogged] windows[.]"  He saw that
a man, defendant, was inside and appeared to be asleep,
leaning back with his head against the vehicle's frame
or seat.  The officer attempted to open the car door,
but it was locked.  He knocked on the car window,
seemingly awakening defendant.  After defendant rolled
down his window, the officer asked for identification.

Defendant produced a driver's license and social
security card, which matched the name of the missing
person.

    The officer returned to his police car.  He
radioed his headquarters, requesting that a call be
made to the police in Jefferson Township to "verify the
hit."  Again, the officer explained:

    Q Why do you do that, verify the hit?

    A To validate it, make sure that in cases of
    criminal wants that you're not arresting the
    wrong person, <u>but in this case it would be a</u>
    <u>welfare check to ensure the welfare and well-</u>
    <u>being of the individual named in the want.</u>

    Q What is your understanding of the
    characterization of missing?  When you get
    that over your MDT what does that convey to
    you?  What did it convey to you in this
    particular situation?

    A Missing person is somebody that was
    reported by concerned individuals as to have
    been missing, not being seen, an unaccounted
    whereabouts.

    Q Now I think you've already answered this,
    but how did you attempt to verify that
    information from Jefferson?

    A I requested police headquarters to contact
    Jefferson Police Department initially [] by
    telephone, again, to verify the missing
    person want.  Then as a matter of
    departmental procedure a computer teletype is
    also sent to that agency requesting hit
    confirmation.

    Q And you did this from your patrol vehicle?

    A Yes, sir.

    [Emphasis added by Supreme Court of New
    Jersey.]

After the first officer left the driver's side of defendant's car to confirm the missing person's report, the second officer began speaking with defendant.  In response to the officer's question, defendant stated that he did not know that he had been reported missing.  Defendant also indicated that he did not know why someone would report him missing.  Asked by the officer to state his itinerary, defendant indicated that he had traveled from Jefferson Township and was headed to his father's home in Paterson.  When asked why he had pulled into the hotel's parking lot, defendant stated that he was tired and wanted to sleep.

While the second officer conversed with defendant, the first officer returned to the vehicle and stated that he intended to place defendant in the officer's police vehicle while they awaited the confirming information from the Jefferson Township police.  At that time, it was raining.  The first officer testified that he had decided to "secure [defendant] in the back of the patrol car until Jefferson ... [got] back to us one way or the other, whether or not he's actually wanted or not."  Later in his direct examination, the officer reiterated his intention in placing defendant in the police car:

> Q I want to go back to the point at which you decided to place [defendant] in the back of the patrol car.  And my question is what did you intend to do after placing him there, what process were you intending to go through?
>
> A Simple verification through Jefferson Township to check on the welfare of the individual, find out why he was in the computer as a missing person, not only missing, but missing endangered with the classification of being endangered.  Again, it was simply a welfare check and at this point to decide to put him in the rear of the squad car was for reasons of officer safety as well as safety to the individual.

The second officer corroborated that testimony, explaining, "[w]e determined that it would be best to have the driver exit his vehicle and be brought back to

5

the patrol vehicle until the situation could be sorted out."

The second officer also testified that "for officer's safety as well as [defendant's] own safety I asked him to turn towards the vehicle so I could pat him down."  As the officer patted down defendant's front pocket, he felt what he believed was a "large metal object[.]" According to the officer, he asked defendant to identify the object and defendant stated, "I don't know, sir."  The officer indicated that the item "ran almost the length of the pocket and it felt like a very hard metal type object in the pocket."  As he began to remove the item from the pocket, the officer again asked defendant to identify it. Defendant stated that it was "a clip."  The officer understood that response to mean "an ammunition magazine for a handgun or any type of ammunition magazine."

After the officer removed the object and observed that it was an ammunition clip, he determined "for [his] safety as well as ... [the other officer's] safety," that they should handcuff defendant until the pat-down search was completed.  Accordingly, the first officer placed handcuffs on defendant and completed the search.  The police found no other objects on defendant.  After examining the clip, the second officer determined that it contained bullets.

The second officer asked defendant to reveal the location of the gun that was associated with the ammunition clip.  Defendant replied that it would be found under his car's front seat.  The officer then retrieved a 9mm semi-automatic handgun from that location.  The gun was loaded with an ammunition clip and a bullet inside its chamber.  Thus, in addition to the gun, the officers found two ammunition clips, one in defendant's pocket and the other in the gun itself.

The officers transported defendant to police headquarters and subsequently learned that the NCIC report was in error.  The gun later was identified as the weapon used in a robbery and murder that had occurred at a gas station earlier on April 8, 1998, in Pequannock, Morris County.  The police informed defendant of his rights as required under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694

(1966).  After waiving those rights, defendant
incriminated himself in a taped statement.
Fingerprints found at the gas station and other
evidence also connected defendant to the crimes.

State v. DiLoreto, 180 N.J. 264, 269-74 (N.J. 2004).

B.   Procedural History

A grand jury indicted Petitioner for purposeful or knowing
murder, N.J.S.A. 2C:11-3a(1) or (2), armed robbery, N.J.S.A.
2C:15-1a (two counts), possession of a weapon for an unlawful
purpose, N.J.S.A. 2C:39-4a, and felony murder, N.J.S.A. 2C:11-
3a(3).  The case proceeded as a capital case.

Petitioner made a pre-trial motion to suppress the gun,
ammunition, and statements to police, which the trial court
denied.  Petitioner subsequently pleaded guilty to all counts.
The sentencing jury could not reach a unanimous agreement as to
the penalty.  Accordingly, Petitioner was sentenced to an
aggregate term of life imprisonment plus a consecutive term of 20
years imprisonment with 83-3/4 years parole ineligibility, under
the No Early Release Act ("NERA:), N.J.S.A. 2C:43-7.2.

Petitioner appealed, challenging the denial of his motions
to suppress and the sentence, challenging application of the NERA
and consecutive sentences.  The Appellate Division remanded for
resentencing on the NERA claim, but otherwise affirmed.  State v.
DiLoreto, 362 N.J. Super. 600 (App. Div. 2003).

Petitioner appealed to the New Jersey Supreme Court, which
denied certification as to the consecutive sentence question, but

which addressed and affirmed on the suppression issues.  <u>State v.</u>

<u>DiLoreto</u>, 180 N.J. 264 (2004).

This Petition followed.  Respondents have answered on the

merits and this matter is now ready for disposition.

II.  <u>28 U.S.C. § 2254</u>

As amended by the Antiterrorism and Effective Death Penalty

Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent

part:

> (a) The Supreme Court, a Justice thereof, a circuit
> judge, or a district court shall entertain an
> application for a writ of habeas corpus in behalf of a
> person in custody pursuant to the judgment of a State
> court only on the ground that he is in custody in
> violation of the Constitution or laws or treaties of
> the United States.

With respect to any claim adjudicated on the merits in state

court proceedings, the writ shall not issue unless the

adjudication of the claim

> (1) resulted in a decision that was contrary to,
> or involved an unreasonable application of, clearly
> established Federal law, as determined by the Supreme
> Court of the United States; or

> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of the
> evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court

precedent "if the state court applies a rule that contradicts the

governing law set forth in [Supreme Court] cases," or "if the

state court confronts a set of facts that are materially

8

indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J., for the Court, Part II).  A state court decision "involve[s] an unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an "unreasonable application" of federal law "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," (although the Supreme Court expressly declined to decide the latter).  Id. at 407-09.  To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable. Id. at 409.  In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts. Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference.  Chadwick v. Janecka, 302 F.3d 107, 116 (3d Cir. 2002) (citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)).  With respect to claims

presented to, but unadjudicated by, the state courts, however, a

federal court may exercise pre-AEDPA independent judgment.  See

Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000),

cert. denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL

1523144, *6 n.4 (D.N.J. 2000).  See also Schoenberger v. Russell,

290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and

cases discussed therein).

The deference required by § 2254(d) applies without regard

to whether the state court cites to Supreme Court or other

federal caselaw, "as long as the reasoning of the state court

does not contradict relevant Supreme Court precedent."  Priester

v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004) (citing Early v.

Packer, 537 U.S. 3 (2002); Woodford v. Visciotti, 537 U.S. 19

(2002)).

Although a petition for writ of habeas corpus may not be

granted if the Petitioner has failed to exhaust his remedies in

state court, a petition may be denied on the merits

notwithstanding the petitioner's failure to exhaust his state

court remedies.  See 28 U.S.C. § 2254(b)(2); Lambert v.

Blackwell, 387 F.3d 210, 260 n.42 (3d Cir. 2004); Lewis v.

Pinchak, 348 F.3d 355, 357 (3d Cir. 2003).

Finally, a pro se pleading is held to less stringent

standards than more formal pleadings drafted by lawyers.  Estelle

v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S.

10

519, 520 (1972).  A pro se habeas petition and any supporting

submissions must be construed liberally and with a measure of

tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998);

Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989);

United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969),

cert. denied, 399 U.S. 912 (1970).]

### III.   ANALYSIS

A.   Fourth Amendment Claims

Petitioner contends that the officers violated his right,

under the Fourth Amendment, to be free from unreasonable searches

and seizures when they (1) ordered him to step out of his

vehicle, (2) performed a pat-down search, (3) reached into his

pocket to retrieve the metal object that could be felt during the

pat-down search, and (4) handcuffed and questioned him about the

whereabouts of the gun without first advising him of his

constitutional rights.

The Supreme Court of New Jersey considered and rejected

these claims.  In a carefully reasoned opinion, the Supreme Court

of New Jersey determined that the actions of the officers were

justified under the "community caretaking" and "exigent

circumstances" exceptions to the warrant requirement of the

Fourth Amendment.  State v. DiLoreto, 180 N.J. at 274-83.

The Fourth Amendment to the U.S. Constitution, made

applicable to the states through the Due Process Clause of the

Fourteenth Amendment, see Mapp v. Ohio, 367 U.S. 643 (1961),

provides:

> The right of the people to be secure in their persons,
> houses, papers, and effects, against unreasonable
> searches and seizures, shall not be violated, and no
> Warrants shall issue, but upon probable cause,
> supported by Oath or affirmation, and particularly
> describing the place to be searched, and the persons or
> things to be seized.

U.S. Const., Amend. IV.  Generally, speaking, evidence gained

from a Fourth Amendment violation may not be used against a

defendant at trial.  See Mapp v. Ohio, 367 U.S. at 654-55; Weeks

v. United States, 232 U.S. 383, 391-93 (1914).

> In Stone v. Powell, 428 U.S. 465, 96 S.Ct. 3037,
> 49 L.Ed.2d 1067 (1976), the Supreme Court examined the
> nature of the exclusionary rule, which it characterized
> as a "judicially created means of effectuating the
> rights secured by the Fourth Amendment" and balanced
> its utility as a deterrent against the risk of
> excluding trustworthy evidence and thus "deflect[ing]
> the truthfinding process."  Id. at 482, 490, 96 S.Ct.
> 3037.  Find that, as to collateral review, the costs of
> the exclusionary rule outweighed the benefits of its
> application the Court concluded that "where the State
> has provided an opportunity for full and fair
> litigation of a Fourth Amendment claim, a state
> prisoner may not be granted federal habeas corpus
> relief on the ground that evidence obtained in an
> unconstitutional search or seizure was introduced at
> his trial."  Id. at 494, 96 S.Ct. 3037.  While the
> federal courts are not thus deprived of jurisdiction to
> hear the claim, they are -- for prudential reasons --
> restricted in their application of the exclusionary
> rule.  Id. at 494 n. 37, 96 S.Ct. 3037.

Marshall v. Hendricks, 307 F.3d 36, 81-82 (3d Cir. 2002).  "An

erroneous or summary resolution by a state court of a Fourth

Amendment claim does not overcome the bar." Gilmore v. Marks, 799 F.2d 51, 57 (3d Cir. 1986).

The Court of Appeals for the Third Circuit has recognized that there may be instances in which a full and fair opportunity to litigate was denied in state court. See, e.g., Gilmore v. Marks, 799 F.2d at 57 (observing that a state's "failure to give at least colorable application of the correct Fourth Amendment constitutional standard" might amount to a denial of the opportunity for full and fair litigation); Boyd v. Mintz, 631 F.2d 247, 250 (3d Cir. 1980) (assuming, without deciding, that "opportunity" simply means providing procedures by which one can litigate a Fourth Amendment claim, Stone v. Powell does not preclude federal habeas relief when "'the defendant is precluded from utilizing it by reason of an unconscionable breakdown in that process'" (quoting Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977), cert. denied, 434 U.S. 1038 (1978))).

This case does not present one of those instances. Petitioner was provided a pre-trial suppression hearing, and two levels of appeal from the denial of his suppression motion. The Supreme Court of New Jersey carefully reviewed the development of applicable Fourth Amendment caselaw and applied it to the facts of Petitioner's case. 850 A.2d at 274-282. Petitioner has been afforded a full and fair opportunity in the New Jersey court

system to litigate his Fourth Amendment claim.  Accordingly, this

Court cannot grant Petitioner habeas relief on this claim.

B.    Fifth Amendment Claims

Petitioner contends that the officers violated his rights

under the Fifth Amendment when they questioned him about the

whereabouts of a handgun without first advising him of his

constitutional rights.

The Supreme Court of New Jersey adopted the holding of the

Appellate Division rejecting this claim.

> "Nor is suppression of the gun required because
> the police asked defendant where the gun was located.
> Particularly in these circumstances in which defendant
> had not been arrested for a crime, the limited inquiry
> could be made in the interests of public safety."

State v. DiLoreto, 180 N.J. at 282 (quoting State v. DiLoreto,

362 N.J. Super. 600, 628 (App. Div. 2003) (citing, inter alia,

New York v. Quarles, 467 U.S. 649, 659 n.8 (1984) (other

citations omitted))).

Pursuant to the Fifth Amendment to the United States

Constitution, "No person ... shall be compelled in any criminal

case to be a witness against himself ... ."  In Miranda v.

Arizona, the Supreme Court of the United States held that:

> when an individual is taken into custody or otherwise
> deprived of his freedom by the authorities in any
> significant way and is subjected to questioning, the
> privilege against self-incrimination is jeopardized.
> Procedural safeguards must be employed to protect the
> privilege and unless other fully effective means are
> adopted to notify the person of his right of silence
> and to assure that the exercise of the right will be

scrupulously honored, the following measures are
required.  He must be warned prior to any questioning
that he has the right to remain silent, that anything
he says can be used against him in a court of law, that
he has the right to the presence of an attorney, and
that if he cannot afford an attorney one will be
appointed for him prior to any questioning if he so
desires.  Opportunity to exercise these rights must be
afforded to him throughout the interrogation.  After
such warnings have been given, and such opportunity
afforded him, the individual may knowingly and
intelligently waive these rights and agree to answer
questions or make a statement.  But unless and until
such warnings and waiver are demonstrated by the
prosecution at trial, no evidence obtained as a result
of interrogation can be used against him.

384 U.S. at 478-79 (footnote omitted).  Thus, Miranda warnings

exist to protect a defendant's Fifth Amendment rights to remain

silent and to the assistance of an attorney during custodial

interrogation.

The Supreme Court has recognized, however, that there are

situations "where concern for public safety must be paramount to

adherence to the literal language of the prophylactic rules

enunciated in Miranda."  New York v. Quarles, 467 U.S. 649, 653

(1984) (footnote omitted).  In Quarles, police officers were

approached by a woman who reported that she had just been raped,

described the offender, and reported further that he was carrying

a gun and had just entered a nearby supermarket.  One of the

officers apprehended the suspect, frisked him, and discovered

that he was wearing a shoulder holster which was then empty.

After handcuffing the suspect, the officer asked him where the

gun was.  The suspect nodded and responded, "the gun is over

15

there."   After retrieving the gun, the officer formally placed

the suspect under arrest and read him his <u>Miranda</u> rights from a

printed card.   There was no suggestion of actual coercion in

obtaining the suspect's statement.

In holding admissible the suspect's statement, "the gun is

over there," the Court declined to impose a "good faith"

requirement.

> In a kaleidoscopic situation such as the one
> confronting these officers, where spontaneity rather
> than adherence to a police manual is necessarily the
> order of the day, the application of the exception
> which we recognize today should not be made to depend
> on post hoc findings at a suppression hearing
> concerning the subjective motivation of the arresting
> officer.  Undoubtedly most police officers, if placed
> in Officer Kraft's position, would act out of a host of
> different, instinctive, and largely unverifiable
> motives -- their own safety, the safety of others, and
> perhaps as well the desire to obtain incriminating
> evidence from the suspect.
>
> Whatever the motivation of individual officers in
> such a situation, we do not believe that the doctrinal
> underpinnings of Miranda require that it be applied in
> all its rigor to a situation in which police officers
> ask questions reasonably prompted by a concern for the
> public safety. ...
>
> ...
>
> We conclude that the need for answers to questions
> in a situation posing a threat to the public safety
> outweighs the need for the prophylactic rule protecting
> the Fifth Amendment's privilege against self-
> incrimination. ...
>
> In recognizing a narrow exception to the Miranda
> rule in this case, we acknowledge that to some degree
> we lessen the desirable clarity of that rule.  At least
> in part in order to preserve its clarity, we have over
> the years refused to sanction attempts to expand our

> Miranda holding. ...  As we have in other contexts, we
> recognize here the importance of a workable rule "to
> guide police officers who have only limited time and
> expertise to reflect on and balance the social and
> individual interests involved in the specific
> circumstances they confront." ...  But as we have
> pointed out, we believe that the exception which we
> recognize today lessens the necessity of that on-the-
> scene balancing process.  The exception will not be
> difficult for police officers to apply because in each
> case it will be circumscribed by the exigency which
> justifies it.  We think police officers can and will
> distinguish almost instinctively between questions
> necessary to secure their own safety or the safety of
> the public and questions designed solely to elicit
> testimonial evidence from a suspect.

Quarles, 467 U.S. at 656-59 (citations and footnotes omitted).

Upon recognizing the "public safety" exception, the Court also

noted that it was error to exclude the suspect's subsequent

statements as illegal fruits of a Miranda violation.  Quarles,

467 U.S. at 660.

The decision of the Supreme Court of New Jersey that

Petitioner's statements to police were admissible under the

"public safety" exception to the Miranda rule is neither contrary

to nor an unreasonable application of clearly-established federal

law.  Cf. United States v. Johnson, 95 Fed.Appx. 448 (3d Cir.

2004) (unpubl.).  Nor is it based on an unreasonable

determination of the facts in light of the evidence presented.

Petitioner is not entitled to relief on this claim.

C.   Sixth Amendment Claim

Petitioner contends that the officers violated his right to

counsel under the Sixth Amendment when they questioned him about

17

the whereabouts of a gun without first advising him of his

constitutional rights.[2]

The Sixth Amendment provides that "[i]n all criminal

prosecutions, the accused shall enjoy the right ... to have the

Assistance of Counsel for his defence."  The Sixth Amendment

right to counsel "is offense specific.  It cannot be invoked once

for all future prosecutions, for it does not attach until a

prosecution is commenced, that is, at or after the initiation of

adversary judicial criminal proceedings -- whether by way of

formal charge, preliminary hearing, indictment, information, or

arraignment."  McNeil v. Wisconsin, 501 U.S. 171, 175 (1991)

(citations and internal quotation marks omitted).

Here, the officer's question to Petitioner about his gun,

took place before any prosecution was commenced.  Thus, there was

no violation of Petitioner's Sixth Amendment right to counsel.

Petitioner is not entitled to relief on this claim.

### IV.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or

judge issues a certificate of appealability, an appeal may not be

taken from a final order in a proceeding under 28 U.S.C. § 2254.

---

[2] Petitioner raised this claim before the Appellate Division
but does not appear to have raised it before the Supreme Court of
New Jersey.  Respondents do not assert that the claim is
unexhausted.  Because the claim is patently meritless, this Court
will exercise its authority to deny relief.  See 28 U.S.C.
§ 2254(b)(2).

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).

Here, Petitioner has failed to make a substantial showing of the denial of a constitutional right.  No certificate of appealability shall issue.

## V.   CONCLUSION

For the reasons set forth above, the Petition must be denied.  An appropriate order follows.


                                      S/ Dennis M. Cavanaugh
                                     Dennis M. Cavanaugh
                                     United States District Judge

Dated: 7/6/06

19